Peter A. Orville, Esq.
Peter A. Orville, P.C.
30 Riverside Drive
Binghamton, New York 13905

Patrick G. Radel, Esq.
Getnick Livingston Atkinson & Priore, LLP
258 Genesee Street, Suite 401
Utica, New York 13502

*In Re:  Howe Farms LLC (Lead Case)*
        Chapter 12 Case No.: 13-61601

        *Richard C. Howe*
        Chapter 12 Case No.: 14-60223

        *Mark F. Howe*
        Chapter 12 Case No.: 14-60360

## LETTER-DECISION AND ORDER

Before the Court is an objection to confirmation of a joint Chapter 12 plan proposed in

the jointly administered cases by Debtors Howe Farms LLC, Richard C. Howe, and Mark F.

Howe ("Debtors") on April 30, 2014.  (The "Joint Plan," ECF No. 61.)  NBT Bank, National

Association ("NBT"), a secured creditor in the cases, filed the objection on May 29, 2014.  (The

"Objection," ECF No. 71.)  Despite counsels' best efforts over the past several months, the

parties have been unable to reach a resolution as to the treatment of NBT's secured claims

collateralized by personal property.  Accordingly, the parties have asked the Court to determine

the narrow issue of whether Debtors' proposed treatment of NBT's personal property secured

claims is commercially reasonable and therefore satisfies the requirement of 11 U.S.C.

("Bankruptcy Code") § 1225(a)(5)(B)(ii), which provides that "the value, as of the effective date

of the plan, of property to be distributed by the trustee or the debtor under the plan on account of

such claim is not less than the allowed amount of such claim."  11 U.S.C. § 1225(a)(5)(B)(ii)

(2012).  The Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334(a) and 157(a), (b)(1), and (b)(2)(L).

Debtors Howe Farms LLC, Richard C. Howe, and Mark F. Howe filed their voluntary Chapter 12 petitions on October 1, 2013, February 18, 2014, and March 12, 2014, respectively. Through counsels' ongoing negotiations, the parties have agreed to adequate protection payments and the relevant facts underpinning this dispute.  The parties filed a Joint Stipulation of Facts on July 23, 2014.  (The "Stipulation," ECF No. 92.)  NBT and Debtors also filed memoranda of law on August 11, 2014.  (ECF Nos. 98 and 101, respectively.)  Together with their memorandum of law, Debtors filed an Affidavit of Mark F. Howe.  (The "Howe Affidavit," ECF No. 101.)  Together with its memorandum of law, NBT filed an Affidavit of Mary A. Pulver, Vice President in the Commercial Lending Division and Senior Agricultural Relationship Manager for NBT.  (The "Pulver Affidavit," ECF No. 99.)  NBT filed a reply letter brief on August 13, 2014.  (ECF No. 104.)  Following a hearing on September 9, 2014, the Court then took the matter under advisement for issuance of this Letter-Decision and Order.

NBT holds a first priority, duly perfected security interest in accounts, livestock, and farm equipment owned by Howe Farms LLC.  (Stip. ¶ 6.)  NBT does not dispute either that its personal property claims are substantially undersecured and therefore subject to "cram down" under Bankruptcy Code § 1225(a)(5)(B) or that the fair market value of its personal property collateral was $367,300.00 as of the date of filing, which figure was comprised of $110,000.00 in livestock, $6,000.00 in bank account funds, and $251,300.00 in farm equipment.  (NBT's Mem. of Law at 2; Stip. ¶ 7.)  NBT does, however, object to Debtors' proposed "cram down" terms. Debtors propose under the Joint Plan to pay all of their monthly disposable income of $3,000.00 into the Joint Plan for sixty (60) months and to repay NBT's secured claims, which totaled

$1,310,473.60 as of the date of filing (Stip. ¶ 2), as long-term debt to be paid in full over thirty (30) years at the rate of 5% interest per annum in monthly payments of $2,684.11, or $32,209.32 annually.[1]    Debtors have since conceded that the Joint Plan's original terms with respect to NBT's personal property secured claims are not commercially reasonable and they have alternatively in their memorandum of law proposed to pay these claims as long-term debt to be amortized over a twelve (12) year period at the rate of 6% per annum with a balloon payment due at the end of seven (7) years.  (Debtors' Mem. of Law at 5–6.)

NBT asserts in its Objection and submissions that the proposed treatment of its personal property secured claims is not commercially reasonable and does not afford it the present value of these claims because: (1) the reamortized repayment term greatly exceeds the original loan terms; and (2) the interest rate is far below the interest rate that the market would impose upon an obligation of similar circumstances and risk. NBT's analysis focuses more precisely on factors such as the preexisting contract terms between the parties, customary lending practices, the nature of the collateral, the propriety of a balloon payment, and the risk of default.

---

[1] The parties have reached an agreement for the repayment of NBT's secured claims collateralized by real property. NBT's real property secured claims will be allowed in the aggregate amount of $310,000.00, to be paid in full over twenty (20) years at a rate of 5.25% per annum in monthly payments of $2,088.92.  (Stip. ¶ 5.)  The Joint Plan contemplates the payment of these and other claims by the Trustee.  Simple calculations show that the Joint Plan, as filed, is significantly underfunded and infeasible.  Payment on NBT's secured claims alone under the agreed and proposed terms would amount to significantly more than Debtors' proposed monthly plan payment.  The Joint Plan is insufficient to fund even these Class I claims, leaving no funds from which the Trustee may pay the Trustee's commissions, administrative claims, or Class III, IV, or V claims.  NBT has also objected to the Joint Plan on the ground that it fails to satisfy the feasibility requirement of Bankruptcy Code § 1225(a)(6), which provides that "the debtor will be able to make all payments under the plan and to comply with the plan."  11 U.S.C. § 1225(a)(6).  The Trustee has similarly objected to the Joint Plan on the grounds that it fails to satisfy the best interests of creditors and feasibility tests set forth in Bankruptcy Code § 1225(a)(4) and (a)(6), respectively.  ("Trustee's Supplemental Objection," ECF No. 90.)  See 11 U.S.C. § 1225(a)(4) (requiring a Chapter 12 plan to provide for the holders of allowed unsecured claims to receive property worth at least as much under the plan as they would receive if the bankruptcy estate were instead liquidated under Chapter 7 and they were paid with liquidation proceeds) and (a)(6). Following the Court's limited ruling herein, Debtors will therefore need to reassess their situation to determine whether they have the financial means to continue in Chapter 12 and, more immediately, whether they can successfully defend NBT's pending motion for relief from stay made pursuant to Bankruptcy Code § 362(d).  NBT filed the motion for relief from stay on October 4, 2013.  (The "Stay Relief Motion," ECF No. 5.)  At NBT's request and pursuant to the most recent adequate protection order issued on October 8, 2014, the Stay Relief Motion has been restored to and made returnable on the Court's October 20, 2014 motion calendar.  (ECF No. 106.)

With regard to the repayment term, NBT acknowledges that Bankruptcy Code § 1229(b)(9) explicitly permits secured claims to be paid over a long-term period exceeding the plan term. *See* 11 U.S.C. § 1229(b)(9). NBT contends, however, that there is an outside limit the Court must impose on the length of repayment on a case-by-case basis by reference to the original loan terms, customary lending practices, and market standards.

Here, Mark F. Howe, Scott A. Howe, and/or Richard C. Howe executed five (5) promissory notes payable to NBT. The first promissory note was payable on demand, with a variable interest rate that was initially 9.250%. (Pulver Aff. ¶¶ 12–13.) The second through fourth promissory notes were payable in twelve (12) months, with a variable interest rate that was initially 5.50%. (Pulver Aff. ¶¶ 14–19.) The fifth promissory note was payable in eight (8) months, with a variable interest rate that was initially 6.0%. (Pulver Aff. ¶¶ 20–21.)

NBT's designated expert, Ms. Pulver, opines that customary lending practices would not allow for repayment of a loan secured only by livestock and farm equipment over a twelve (12) or thirty (30) year period, even with a seven (7) year balloon payment. (Pulver Aff. ¶ 25.) Rather, Ms. Pulver states that customary lending terms for this type of loan range from five (5) to seven (7) years, with seven (7) year terms being extended only to borrowers with outstanding credit and favorable loan to value ratios. (Pulver Aff. ¶ 27.) Ms. Pulver's analysis of Debtors' herd maintenance statistics, financial history, and loan to value ratio of 1:1 leads her to conclude that Debtors would not be able to receive financing from any commercial lender. She suggests that, even if a commercial lender would lend under such circumstances, it is likely that the indebtedness would be payable "on demand" or on a very short one (1) to two (2) year schedule—which is consistent with the terms upon which NBT was lending to Debtors when they filed for bankruptcy protection. The seven (7) year balloon payment does not change Ms.

Pulver's analysis because Debtors did not offer proof either that they will be able to fund the same or that the value of the collateral will remain stable during that length of time. (Pulver Aff. ¶ 34.)

With regard to the interest rate, NBT contends that the same considerations– the original loan terms, customary lending practices, and market standards–govern the interest rate determination. In Ms. Pulver's experience, agricultural borrowers with good financial prospects, but past credit problems, typically receive rates between 7.25% and 8.5%. (Pulver Aff. ¶ 35.) She avers that, based on Debtors' history and present financial condition, they are a high risk borrower for a lender to extend credit to and, therefore, an appropriate interest rate for such credit would be between 9% and 10%. Ms. Pulver further opines that, based on her analysis of Debtors' financial projections and operating reports, the risk of default and irreparable harm to NBT is significant because Debtors' financial projections are unreasonable, their monthly operating reports show negative cash flow and a significant, recurring monthly deficit, and the collateral securing NBT's personal property claims is highly vulnerable and subject to rapid depreciation. (Pulver Aff. ¶¶ 37–40.)

Debtors, on the other hand, argue that their proposed terms for the repayment of NBT's personal property secured claims are commercially reasonable because the value of the collateral will remain stable or increase over the course of seven (7) years and NBT has in the past issued loans to Debtors upon terms where monthly payments were based on long amortization schedules with balloon payments at a much earlier maturity date. Debtors suggest that the parties' past dealings and lending relationship should be given considerably more weight than customary lending practices and market standards. (Debtors' Mem. of Law at 7.) Moreover, Debtors assert that they have in good faith shown that they will be able to make the required

balloon payment at the end of seven (7) years, and they urge the Court to consider that the difference between the terms they have proposed and those advocated by NBT could very well be the difference between the Joint Plan's success or failure.  In particular, Mark F. Howe states that Debtors will be able to pay the balloon payment when due because he believes there will be sufficient equity in the livestock and farming equipment to cover the balloon payment and he believes that Debtors will be able to obtain a new loan to payoff NBT either through an institutional or private lender once he can show at least four (4) years of consistent Chapter 12 plan payments.  (Howe Aff. ¶¶ 2, 4–5.)

As the Plan's proponent, Debtors bear the burden of proving that the Joint Plan satisfies all of the requirements for confirmation set forth in Bankruptcy Code § 1225(a), including the present value requirement under subsection (a)(5)(B)(ii).  *In re Torelli*, 338 B.R. 390, 395 (Bankr. E.D. Ark. 2006) (collecting cases); *In re Michels*, 301 B.R. 9, 13 (Bankr. N.D. Iowa 2003) (citing *In re Szudera*, 269 B.R. 837, 842 (Bankr. D. N.D. 2001)), *aff'd*, *Michels v. Maynard Sav. Bank (In re Michels)*, 305 B.R. 868 (B.A.P. 8th Cir. 2004).  It is well established that a secured creditor in bankruptcy is entitled to the full value of its secured claim.  *In re Foertsch*, 167 B.R. 555, 563 (Bankr. D. N.D. 1994) (citing *In re Kloberdanz*, 83 B.R. 767, 770 (Bankr. D. Colo. 1988)).  However, a Chapter 12 debtor is permitted to treat a secured creditor's claim as a long-term debt payable beyond the length of the plan pursuant to Bankruptcy Code § 1222(b)(9) if the plan provides that the secured creditor will retain its lien and receive the present value of its claim in compliance with Bankruptcy Code § 1225(a)(5)(B).  11 U.S.C. § 1222(b)(9). In cases where the secured creditor refuses to accept the proposed plan, Bankruptcy Code § 1225(a)(5)(B) allows the debtor to retain liened collateral and "cram down" a creditor's allowed

secured claim if the value of the claim is "demonstrably preserved." *In re Foertsch*, 167 B.R. at 563 (citing *In re Fenske*, 96 B.R. 244, 248 (Bankr. D. N.D. 1988)).

The present value requirement under Bankruptcy Code § 1225(a)(5)(B)(ii) forces the debtor to provide for payments to creditors over a reasonable repayment term at a reasonable rate of interest. *In re Standley*, 2013 Bankr. LEXIS 1114, at *16 (Bankr. D. Mont. Mar. 22, 2013) (citing *In re Steinmetz*, 10 B.R. 150, 158 (Bankr. D. Mont. 1991)). The Court will briefly address each prong of this requirement and its application to the Joint Plan.

"While the Code does not specifically limit the repayment period, the present value and feasibility provisions imply such limits." *In re Torelli*, 338 B.R. at 397 (citing *In re Dunning*, 77 B.R. 789, 793 (Bankr. D. Mont. 1987) (quoting *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125 (Bankr. D. Mont. 1987)). "When considering the length of loan term, the court can base a ruling on such facts as the preexisting contract length and the customary length of repayment of similar loans." *Id.* (collecting cases).

In the present case, of the five (5) promissory notes executed by Debtors Mark F. Howe, Scott A. Howe, and/or Richard C. Howe and made payable to NBT, the longest original repayment term was twelve (12) months, which in turn carried a variable interest rate that was initially 5.5%. (Pulver Aff. ¶¶ 12–21.) Given the original repayment terms, the current feasibility problem with the Joint Plan, and Ms. Pulver's valid concerns regarding depreciation and risk of loss of the collateral given the nature of the collateral, the Court agrees with NBT that Debtors' proposed repayment term is well outside the acceptable parameters that this Court may approve.

Even if Debtors' proposed repayment term was sufficient for purposes of Bankruptcy Code § 1225(a)(5)(B)(ii), which it is not, Debtors would need to prove that their proposed

interest rate is also reasonable.  Payments provided under a plan of reorganization that proposes to pay the secured creditor of an allowed secured claim in deferred installments must be discounted by an appropriate or equitable rate of interest.  *In re Michels*, 301 B.R. at 16; *In re Howard*, 212 B.R. 864, 870–71 (Bankr. E.D. Tenn. 1997) ("Although in actuality the rate to be determined is a discount rate rather than a true interest rate, courts and litigants usually speak in terms of interest rate because the easiest way to determine present value for purposes of [Bankruptcy Code] § 1225(a)(5)(B)(ii) . . . is to ascertain the allowed amount of the secured claim and then apply to that amount an appropriate interest rate to ensure that the present value of payments to the secured creditor will at least equal the allowed amount of the secured claim.") (internal citation omitted).  The determination of whether the proposed discount or interest rate is appropriate or equitable in the face of an objection by the secured creditor is a factual inquiry that must be made on a case-by-case basis.  *In re Foertsch*, 167 B.R. at 564 (citing *United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir. 1989)).

Since the Bankruptcy Code does not provide any guidance on how to determine an appropriate or equitable rate of interest, courts are necessarily guided by customary lending practices and, more specifically, the current market rate for similar loans made in the region at the time of the reorganization.  *In re Ellis*, 478 B.R. 132, 140 (Bankr. N.D.N.Y. 2012); *In re Foertsch*, 167 B.R. at 564 (collecting cases).  The Court in its interest rate determination must therefore "'consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.'"  *In re Foertsch*, 167 B.R. at 564 (quoting *United States v. Doud*, 869 F.2d at 1146); *see also In re Torelli*, 338 B.R. at 396 (focusing on the United States Supreme Court's dicta in *Till v. SCS Credit Corp.*, 124 S. Ct. 1951 (2004), that several Bankruptcy Code sections, including

Bankruptcy Code § 1225(a)(5)(B)(ii), require a court to discount a stream of deferred payments

back to their present value and directing courts in such cases to begin with and adjust the prime

rate based upon factors such as the circumstances of the estate, the nature of the security, and the

duration and feasibility of the reorganization) (citing *Till v. SCS Credit Corp.*, 124 S. Ct. 1951,

1961 (2004)).

According to Ms. Pulver, whom this Court has no reason to doubt based upon the record

presented, the appropriate interest rate for a new loan to Debtors would be between 9% and 10%

at worst and 7.25% to 8.5% at best.  (Pulver Aff. ¶ 35.)  Given her experience and position in the

agricultural industry, the Court is compelled to accept Ms. Pulver's assertion that this range of

rates is what Debtors would have to pay a creditor in order to obtain a new loan on equivalent

terms in the open market.  Moreover, there is an insufficient equity cushion and a lack of other

safeguards to protect NBT from collateral loss and diminution in collateral value given the nature

of the collateral at issue during the deferred repayment.  These factors, as well as the lack of

evidence to prove that Debtors will be able to make the balloon payment at the end of the seven

(7) year period, suggest that if the Court were to approve Debtors' proposed interest rate, the

value of NBT's interest would be unduly jeopardized.  While the Court is mindful of the need to

strike a balance between adequately compensating NBT for the risks associated with the

proposed "cram down" contemplated by the Joint Plan and the setting of an interest rate that is

not so high as to doom Debtors' reorganization, the Court finds that the 6% interest rate

proposed by Debtors in their memorandum of law does not give NBT the present value of its

personal property secured claims.

In sum, neither Debtors' proposed repayment term nor the interest rate to be applied to

NBT's personal property secured claims are reasonable or consistent with customary lending

practices or market rates.  In fact, Debtors have not provided any evidence to address the burden

they carry.  In stark contrast, NBT has presented Ms. Pulver's convincing testimony in affidavit

form, which Debtors have not adequately challenged or controverted.  Because the Joint Plan and

Debtors' amended proposal to "cram down" NBT's personal property secured claims do not

satisfy the dictates of Bankruptcy Code § 1225(a)(5)(B)(ii), NBT's Objection is sustained and

confirmation of the Joint Plan is denied.

It is SO ORDERED.

Dated: October 16, 2014
        Utica, New York


/s/Diane Davis_____
DIANE DAVIS
United States Bankruptcy Judge